UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AHLSTROM RHINELANDER LLC,
a Delaware limited liability company;
AHLSTROM NA SPECIALTY
SOLUTIONS HOLDINGS INC.,
a Delaware Corporation; and
AHLSTROM NA SPECIALTY
SOLUTIONS LLC,
a Delaware limited liability company;

      Plaintiffs,

vs.

COLONY INSURANCE COMPANY,
a Virginia corporation;

      Defendant.

Civil Case No. 3:24-cv-726-wmc

**PLAINTIFFS' PROPOSED FINDINGS OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REGARDING DEFENDANT COLONY'S BREACH OF ITS DUTY TO DEFEND**

Plaintiffs Ahlstrom Rhinelander LLC, Ahlstrom NA Specialty Solutions Holdings Inc., and Ahlstrom NA Specialty Solutions LLC (collectively, "Ahlstrom") hereby submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment regarding Defendant Colony Insurance Company's ("Colony") breach of its duty to defend.

**A.     The Parties**

1. Plaintiff Ahlstrom NA Specialty Solutions Holdings Inc. is a holding company incorporated under the laws of the State of Delaware with its principal place of business in Connecticut. Complaint., Dkt. 1, ¶ 15; Answer, Dkt. 7, ¶ 15.

2. Plaintiff Ahlstrom NA Specialty Solutions LLC is a limited liability company that has a single member, which is Ahlstrom NA Specialty Solutions Holdings Inc. Complaint., Dkt. 1, ¶ 16; Answer, Dkt. 7, ¶ 16.

3. Plaintiff Ahlstrom Rhinelander LLC is a limited liability company that has a single member, which is Ahlstrom NA Specialty Solutions LLC. Complaint., Dkt. 1, ¶ 17; Answer, Dkt. 7, ¶ 17.

4. Defendant Colony is an insurance company organized under the laws of the State of Virginia, with its principal place of business in Richmond, Virginia, that has written insurance policies covering risks for Wisconsin citizens and/or is otherwise transacting insurance business in the State of Wisconsin. Complaint, Dkt. 1, ¶ 19; Answer, Dkt. 7, ¶ 19.

**B.     The Policy**

5. Colony issued a premises environmental and remediation liability policy, Policy No. PRL4267109 (the "Policy"), to Ahlstrom-Munksjo USA Inc. Complaint., Dkt. 1, ¶ 35; Answer, Dkt. 7, ¶ 35; Declaration of Kevin Dreher, February 21, 2025 ("Dreher Decl."), ¶ 2.

6. A true and complete copy of the Policy is attached to the Dreher Declaration as Exhibit A. Dreher Decl., ¶ 4.

7. The Policy was in effect for the period from April 7, 2021 to April 12, 2024. Policy, Dreher Decl., Ex. A at 74 [Policy Change No. 3].

8. Plaintiffs Ahlstrom NA Specialty Solutions Holdings Inc., Ahlstrom NA Specialty Solutions LLC, and Ahlstrom Rhinelander LLC are **named insureds**[1] under the Policy. Policy, Dreher Decl., Ex. A at 73 [Named Insured Endorsement]; Complaint., Dkt. 1, ¶¶ 15–17; Answer, Dkt. 7, ¶¶ 15–17.

9. Insuring Agreement E in the Policy, "Non-Owned Disposal Site Liability," provides:

> We will pay on behalf of the **insured loss** that the **insured** becomes legally obligated to pay because of a **claim** made against the **insured** by anyone other than an owner, operator or contractor of the **non-owned disposal site**, or any of their employees, for **bodily injury**, **property damage** or **cleanup costs** resulting from a **pollution condition** on, under or migrating from a **non-owned disposal site**, provided:
>
> > 1. the **pollution condition** first commenced on or after the **retroactive date**, if applicable, and before the end of the **policy period**;
> >
> > 2. the **claim** is first made against an **insured** during the **policy period**; and
> >
> > 3. the **claim** is first reported to us, in writing, during the **policy period** or any applicable Extended Reporting Period.

Policy, Dreher Decl., Ex. A at 14 [Non-Owned Disposal Site Liability].

10. The Policy defines **non-owned disposal site** to mean "[a] site or facility in the United States of America that has never been owned, occupied, rented, leased, managed or operated, in whole or in part, by any **insured** and which has received [the **insured's**] **waste** from a **scheduled site** or **job site** for storage, treatment, disposal or recycling, provided that such site or facility: (a) was properly licensed and permitted pursuant to **environmental laws** to accept **waste** generated from a **scheduled**

---

[1] Bolded terms within Policy language used in this Proposed Findings of Fact are terms defined by the Policy.

2

**site** or **job site** at the time of storage, treatment, disposal or recycling; and (b) was not included nor proposed to be included on the National Priorities List (NPL) or any state equivalent list at the time of any storage, treatment, disposal or recycling of your **waste**." Policy, Dreher Decl., Ex. A at 30 [Section VI – Definitions, CC].

11.  The Rhinelander paper mill, located at 515 W Davenport Street, Rhinelander, Wisconsin (the "Rhinelander Site"), is identified in the Policy as a **scheduled site**. Policy, Dreher Decl., Ex. A at 70 [Scheduled Site(s) Endorsement].

12.  The Policy specifies that the **retroactive date** applicable to Insuring Agreement E is December 7, 2008. Policy, Dreher Decl., Ex. A at 2 [Declaration 3].

13.  Insuring Agreement B.2 in the Policy, "New Pollution Conditions – Claims for Bodily Injury, Property Damage or Off-Site Cleanup Costs," provides:

> We will pay on behalf of the **insured loss** that the **insured** becomes legally obligated to pay because of a **claim** for: (i) **bodily injury** or **property damage** resulting from a **pollution condition** on, under or migrating from or through a **scheduled site**, or (ii) **cleanup costs** beyond the boundaries of a **scheduled site** resulting from a **pollution condition** migrating from or through a **scheduled site**, provided such claim is:
>
> > (a) first made against an **insured** during the **policy period**; and
> >
> > (b) first reported to us, in writing, during the **policy period** or any applicable Extended Reporting Period.

Policy, Dreher Decl., Ex. A at 13 [New Pollution Conditions: Claims for Bodily Injury, Property Damage or Off-Site Cleanup Costs].

14.  The Policy states that coverage under Insuring Agreement B.2 applies "only to **pollution conditions** that first commenced on or after the **retroactive date** and before the end of the **policy period**." *Id.*

3

15. The Policy specifies that the **retroactive date** applicable to Insuring Agreement B.2 for the Rhinelander Site is April 7, 2021. Policy, Dreher Decl., Ex. A at 38 [Scheduled Site(s) Endorsement].

16. Insuring Agreement F in the Policy, "Transportation Pollution Liability," provides:

> We will pay on behalf of the **insured loss** that the **insured** becomes legally obligated to pay because of a **claim** for **bodily injury**, **property damage** or **cleanup costs** resulting from a **pollution condition** that is caused by **transportation**, provided:
>
> 1. the **pollution condition** first commenced on or after the **retroactive date**, if applicable, and before the end of the **policy period**;
>
> 2. the **claim** is first made against an **insured** during the **policy period**; and
>
> 3. the **claim** is first reported to us, in writing, during the **policy period** or any applicable Extended Reporting period.

Policy, Dreher Decl., Ex. A at 14 [Transportation Pollution Liability].

17. The Policy defines "**transportation**" to mean "the movement by **conveyance** by the **insured**, or on behalf of the **insured** by a properly licensed, as required, third-party carrier, of goods, products, materials or **waste** beyond the boundaries of any **scheduled site**, **non-owned disposal site** or **job site**, from the place where it is accepted by the **insured** or the carrier until it is moved: (1) to the place where the **insured** or the carrier finally delivers it; or (2) in the case of **waste**, to a waste disposal or treatment facility to which the **insured** or carrier delivers it." Policy, Dreher Decl., Ex. A at 31 [Section VIII – Definitions, LL].

18. The Policy defines "**conveyance**" to mean "any auto, railcar, train, watercraft or aircraft, provided the person or entity transporting the goods, products or **waste** is properly licensed, as required, to transport the materials moved." Policy, Dreher Decl., Ex. A at 26 [Section VIII – Definitions, D].

4

19. The Policy specifies that the **retroactive date** applicable to Insuring Agreement F is December 7, 2008. Policy, Dreher Decl.,. Ex. A at 2 [Declaration 3].

20. The Policy defines "**Bodily injury**" to mean "physical injury, illness, disease, mental anguish, emotional distress or shock, sustained by any person, including death resulting therefrom, and includes medical monitoring costs but only if accompanied by actual physical injury, illness or disease." Policy, Dreher Decl., Ex. A at 26 [Section VIII – Definitions, A].

21. The Policy defines "**Claim**" as "a written notice, demand or assertion of a legal right alleging liability or responsibility on the part of an **insured** for **loss**. **Claim** includes suits and governmental or regulatory actions filed against an **insured**." Policy, Dreher Decl., Ex. A at 26 [Section VIII – Definitions, B].

22. The Policy defines "**Insured**" to mean, as relevant here, any **named insured**. Policy, Dreher Decl., Ex. A at 28 [Section VIII – Definitions, R].

23. The Policy defines "**Loss**" to mean, as relevant here, "monetary awards or settlements of compensatory damages, civil fines, civil penalties and civil assessments; and where insurable by law, punitive, exemplary or the multiplied portion of multiplied damages for **bodily injury** and **property damage**; . . . **cleanup costs**; . . . [and] **legal defense costs**[.]" Policy, Dreher Decl., Ex. A at 29 [Section VIII – Definitions, W].

24. The Policy defines "**Pollution condition**" to mean "(1) the discharge, dispersal, release or escape; or (2) **illicit abandonment**; of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including smoke, vapor, soot, fumes, acids, alkalis, toxic or hazardous substances, electromagnetic fields, chemicals, **waste**, and **microbial matter**, into or upon land or any structure on land, the atmosphere, or any watercourse or body of water, including groundwater, in concentrations or at levels in excess of those naturally present in the environment." Policy, Dreher Decl., Ex. A at 30 [Section VIII – Definitions, EE].

25. The Policy defines "**Property damage**" to mean, as relevant here, "(1) physical injury to, or destruction of, tangible property of parties other than an **insured**, including resulting loss of use thereof; (2) loss of use of tangible property of parties other than an **insured** that has not been physically injured or destroyed; (3) diminished value of tangible property of parties other than an **insured**; or (4) **natural resource damages**." Policy, Dreher Decl., Ex. A at 31 [Section VIII – Definitions, GG].

26. The Policy defines "**Natural resource damage**" to mean, as relevant here, "injury to, destruction of, or loss of value of, . . . land, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States [or] any state or local government[.]" Policy, Dreher Decl., Ex. A at 30 [Section VIII – Definitions, BB].

27. The Policy defines "**Waste**" to mean, as relevant here, "materials to be disposed, recycled, reconditioned or reclaimed." Policy, Dreher Decl., Ex. A at 32 [Section VIII – Definitions, NN].

28. The Policy states that Colony "will have the right and duty to defend the **insured** against a **claim** to which this insurance applies," provided that the insured has exhausted the applicable self-insured retention. Policy, Dreher Decl., Ex. A at 60 [Self-Insured Retention / Aggregate / Maintenance Endorsement] (amending Section III – A & B).

29. The Policy specifies the self-insured retention is $500,000 for each incident. *Id.* (amending Deductible section of Item 3. of the Declarations).

30. The Policy states that "[o]ne self-insured retention Incident shall apply to all **loss** arising out of the same, related, continuous or repeated **pollution condition(s)**." Policy, Dreher Decl., Ex. A at 61 [Self-Insured Retention / Aggregate / Maintenance Endorsement] (amending Section IV – F).

6

31. The Policy further states its Coverage Section Limit "is the most [Colony] will pay under the applicable Coverage for all **loss** arising out of the same, related, continuous, or repeated **pollution condition(s)**." Policy, Dreher Decl., Ex. A at 19 [Section IV – C].

32. The Policy provides that once a claim has been made and reported, "all **claims** arising out of the same, related, continuous or repeated **pollution condition(s)** . . . shall be deemed to have been first made against an **insured** and first reported to us during this **policy period**[.]" Policy, Dreher Decl., Ex. A at 20 [Section IV – H].

33. The Policy includes an exclusion for Known Pollution Conditions, which bars coverage for damages "[a]rising out of any **pollution condition** that was known by a **responsible insured** (1) prior to the **inception date** of this Policy; or (2) prior to the effective date of coverage for any **scheduled site**[.]" Policy, Dreher Decl., Ex. A at 17 [Section II – J].

34. The Known Pollution Conditions Exclusion includes an exception for specifically scheduled pollution conditions: "[h]owever, this exclusion does not apply to **pollution conditions** scheduled on a Known Pollution Conditions Endorsement attached to this Policy." *Id.*; Policy, Dreher Decl., Ex. A at 39 [Known Pollution Conditions Endorsement].

**C.    The Underlying Action**

35. On August 9, 2023, a group of landowners in Oneida County, Wisconsin filed a complaint in which Plaintiffs Ahlstrom Rhinelander LLC, Ahlstrom NA Specialty Solutions Holdings Inc., and Ahlstrom NA Specialty Solutions LLC were each named as a defendant, captioned *Rougeau et al. v. 3M Company, et al.*, No. 3:23-CV-546 (W.D. Wis.) (the "Underlying Action"). Dreher Decl., ¶ 5; Underlying Action Dkts. 1 to 1-6.

36. The complaint in the Underlying Action was subsequently amended on February 8, 2024 and again on October 15, 2024. Dreher Decl., ¶ 6;. Underlying Action Dkts. 29 to 29-4, 88 to 88-2.

7

37. The complaint in the Underlying Action was amended for a third time on October 15, 2024 to include updated jurisdictional allegations. Complaint., Dkt. 1, ¶ 26; Answer, Dkt. 7, ¶ 26; Dreher Decl., ¶ 7; Underlying Action Dkts. 89 to 89-2.

38. The third amended complaint in the Underlying Action is the currently-operative complaint (the "Underlying Complaint"). Complaint., Dkt. 1, ¶ 26; Answer, Dkt. 7, ¶ 26; Dreher Decl., ¶ 7; Underlying Action Dkts. 89 to 89-2.

39. A true and correct copy of the currently-operative third amended complaint in the Underlying Action was attached as Exhibit B to the Complaint in this action. Dkt. 1-2; Complaint, Dkt. 1, ¶ 26; Answer, Dkt. 7, ¶ 26; Dreher Decl., ¶ 7.

40. The Underlying Complaint alleges that another defendant, Wausau Paper Company, "operated the Rhinelander [Site] until August 2, 2013 when the Rhinelander [Site] was transferred to Ahlstrom and/or its successors in interest." Underlying Complaint, Dkt. 1-2, ¶ 42.

41. The Underlying Complaint alleges that "[i]n approximately August of 2013 Wausau Paper Mills, LLC and Wausau Paper Corp. sold the Rhinelander [Site] to Expera Specialty Solutions, LLC and/or other successors in interest to Ahlstrom." *Id.* at ¶ 64.

42. The Underlying Complaint alleges that Ahlstrom "owns and operates the Rhinelander [Site]," located at "515 West Davenport Street, Rhinelander, Wisconsin 54501[.]" *Id.* at ¶¶ 4, 38.

43. The Underlying Complaint alleges that "[a]t the Rhinelander [Site], Ahlstrom and its predecessors used PFAS products manufactured by 3M," that "Wausau Paper and its predecessors used the PFAS products manufactured by 3M," and that, while 3M plans to "exit all PFAS manufacturing by the end of 2025," Ahlstrom "did not cease using PFAS chemicals due to financial considerations" and "plans to completely phase out PFAS use by the end of 2023." *Id.* at ¶¶ 39, 43, 154.

8

44. The Underlying Complaint alleges that Ahlstrom and Wausau Paper "disposed of PFAS-containing waste by spreading tons of this waste on farms in the Rhinelander area." *Id.* at ¶¶ 40, 44.

45. The Underlying Complaint alleges that for "decades until the present, Ahlstrom, Wausau Paper and their predecessors delivered and applied PFAS-laden waste sludge to landowners in the area. As reflected in Annual Land Application Reports, Ahlstrom and Wausau Paper spread millions of pounds of this waste sludge over thousands of acres of farmland." *Id.* at ¶ 67.

46. The Underlying Complaint alleges that "Ahlstrom, Wausau Paper, and their predecessors knew or should have long known of the dangers associated with PFAS in products made and used at the Rhinelander [Site] and knew that disposal of PFAS-containing waste on farmlands could lead to groundwater contamination." *Id.* at ¶ 68.

47. The Underlying Complaint alleges that the Plaintiffs in the Underlying Action are composed of "all owners of real property in Oneida County generally within . . . the class area since September 2022 where the land application of PFAS-containing paper mill sludge has caused harm to property, including (1) properties in the contaminated area where land application of sludge from the Rhinelander [Site] has caused contamination of groundwater and the sole source of drinking water to the property is groundwater . . . ; (2) properties where PFAS-containing paper mill sludge has been land applied; and (3) properties located adjacent to—or which possess riparian rights to--. . . any other surface waterbody within the geographic limitation . . . that contains PFAS as a result of the land application of PFAS-containing paper mill sludge from the Rhinelander [Site]." *Id.* at ¶ 80.

48. The Underlying Complaint alleges that Ahlstrom "released . . . PFAS containing byproducts and waste[.]" *Id.* at ¶ 146.

49. The Underlying Complaint alleges that "Ahlstrom and/or Wausau Paper, and its predecessors disposed of PFAS-laden waste sludge from the Rhinelander [Site]" and that "when waste

9

sludge is applied to farmland, PFAS, including PFOA and PFOS would migrate into soils and waters, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately be difficult and costly to remove from the water" and "contaminate the farms and nearby properties, causing human exposure and resulting health risks." *Id.* at ¶ 128.

50. The Underlying Complaint alleges that Ahlstrom "dispose[d] of PFAS-laden waste sludge from its Rhinelander [Site] by spreading it onto farmland" and that this disposal "contaminate[d] the farms and nearby properties, causing human exposure and resulting health risks." *Id.* at ¶¶ 177–78.

51. The Underlying Complaint alleges that "PFOA and PFOS are stable, man-made chemicals" and that "they tend to stay in the water column and can be transported long distances." *Id.* at ¶ 49.

52. The Underlying Complaint alleges that the "EPA proposed Maximum Contaminant Levels (MCL) for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, GenX, and PFBS." *Id.* at ¶ 54.

53. The Underlying Complaint alleges that the "EPA released a final rule designating PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response Compensation, and Liability Act." *Id.* at ¶ 55.

54. The Underlying Complaint alleges "PFAS . . . would readily escape from . . . PFAS-containing byproducts and waste whenever those products are used, handled, stored, or disposed of (including through disposal of PFAS-waste on farmland)[.]" *Id.* at ¶ 145.

55. The Underlying Complaint alleges that "[i]n Wisconsin, the spreading of paper mill sludge is regulated by the Wisconsin Department of Natural Resources (DNR). Before spreading sludge, companies need to obtain permits that require them to assess and report on the soil characteristics of the land where the sludge will be applied." *Id.* at ¶ 65.

10

56. The Underlying Complaint alleges that "[o]ver the course of decades, Defendant Ahlstrom, Wausau Paper, and their predecessors disposed of millions of pounds of waste from the Rhinelander [Site] by dumping and spreading the waste on farmland throughout Oneida County, and specifically in the Town of Stella." *Id.* at ¶ 2.

57. The Underlying Complaint alleges "PFAS have been detected in well water at [Plaintiffs' properties] at levels exceeding EPA standards." *Id.* at ¶¶ 9–17.

58. The Underlying Complaint alleges that "[a]s a direct result of Defendants' acts alleged in this Complaint, Plaintiffs' Properties have been contaminated, and will continue to be contaminated, with [PFAS]." *Id.* at ¶ 71.

59. The Underlying Complaint alleges that "Plaintiffs own properties injured by PFAS compounds from the Rhinelander [Site]." *Id.* at ¶ 87.

60. The Underlying Complaint alleges that "Plaintiffs own real properties injured by PFAS. Some Plaintiffs and Class Members own private drinking water wells contaminated with PFAS, some own real property contaminated with PFAS, and some own property with or around surface waterbodies that are contaminated with PFAS. Plaintiffs and Class Members with contaminated private wells have been regularly exposed to dangerously high levels of [PFAS] compounds." *Id.* at ¶ 73.

61. The Underlying Complaint divides its proposed "class" into three categories of Plaintiffs: "(a) [p]roperty owners whose property is located in the contaminated area where land application of sludge from the Rhinelander [Site] has caused contamination of groundwater and the sole source of drinking water to the property is groundwater[,]" "(b) [p]roperty owners whose property was a site of land application of sludge from the Rhinelander [Site,]" and "(c) [p]roperty owners whose properties are located adjacent to Snowden Lake, Moen Lake, Second Lake, Third Lake, Fourth Lake, Fifth Lake, Starks Creek, the north branch of the Pelican River, or any other surface that contains

11

PFAS as a result of the land application of PFAS-containing paper mill sludge from the Rhinelander [Site]." *Id.* at ¶ 81.

62. The Underlying Complaint alleges that "Ahlstrom, Wausau Paper, and their predecessors operated, owned, and/or had responsibility for the Rhinelander [Site] during time periods relevant to Plaintiff's claims." *Id.* at ¶ 70.

63. The Underlying Complaint alleges that "[a]s a direct and proximate result of defendants' acts and omissions as alleged in this Complaint: (a) Plaintiffs' water supplies were and continue to be contaminated with PFAS compounds . . . [and] (c) Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring . . . ." *Id.* at ¶ 132.

64. The Underlying Complaint alleges that "[a]s a direct and proximate result of defendants' acts and omissions as alleged in the Complaint," numerous plaintiffs have suffered medical injuries attributable to exposure to PFAS, including "high cholesterol for both Carrie and Kerry Brenton," "thyroid disease in Plaintiff Don Endres," "kidney disease in Diana Pilat," "kidney cancer in Lucinda Marquardt," "high cholesterol for Mr. Szymanski," "high cholesterol for Ms. Szymanski," "high cholesterol for Ms. Deere," and "high cholesterol for Mr. and Mrs. Rosendahl," and that these plaintiffs "have incurred, and will incur, costs and expenses relating to their injuries, and seek[] medical monitoring." *Id.* at ¶ 181.

65. The Underlying Complaint alleges that "Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from both personal injury to certain Plaintiffs, the continuous and ongoing contamination of all Plaintiffs' Properties by Defendants' PFAS, and the continuous and ongoing harm to Plaintiffs and Class Members caused by contamination of surface waterbodies located on or adjacent to Plaintiffs' and Class Members'

12

properties. Such damages moreover include, but are not limited to, the past and future costs of restoring and remediating contamination from their real properties and drinking water wells, loss of use and enjoyment of property, increased costs for septic tank cleanout caused by the presence of the defendants hazardous chemicals, past and future medical expenses (for those alleging personal injuries), loss of earnings, and household expenses, among others." *Id.* at ¶ 78.

**D. The Coverage Dispute and Colony's Unilateral Refusal to Defend Ahlstrom**

66. Ahlstrom timely notified Colony of its receipt of the complaint in the Underlying Action and sought coverage under the Policy. Dreher Decl., ¶ 8; Complaint, Dkt. 1, ¶ 77; Answer, Dkt. 7, ¶ 77.

67. A true and correct copy of Ahlstrom's August 14, 2023 notice to Colony regarding the Underlying Action is attached to the Dreher Declaration as Exhibit B. Dreher Decl., ¶ 8.

68. On September 29, 2023, Colony responded to Ahlstrom's notice with a letter asserting that the Underlying Action did not trigger coverage under the Policy and that, therefore, Colony would not defend or indemnify Ahlstrom (the "Initial Coverage Denial"). Dreher Decl., ¶ 9.

69. A true and correct copy of the Initial Coverage Denial is attached to the Dreher Declaration as Exhibit C. Dreher Decl., ¶ 9.

70. In the Initial Coverage Denial, Colony stated that the allegations in the Underlying Action "do not trigger coverage under the [] Policy—and . . . therefore, no defense or indemnity will be provided." Dreher Decl., Ex. C at 1.

71. In the Initial Coverage Denial, Colony asserted that the Policy did not provide coverage under Insuring Agreement E because that coverage applies only to "non-owned disposal sites," as that term is defined in the Policy, and the complaint in the Underlying Action "does not contain any allegations suggesting that the waste was delivered to a 'non-owned disposal site,' as defined." *Id.* at 10.

13

72. The Initial Coverage Denial also stated that in Colony's view, the Policy did not provide coverage under Insuring Agreement E because that coverage applies only to pollution conditions that first commenced after the retroactive date of December 7, 2008, and that the Underlying Action did not allege any pollution conditions that first commenced after the retroactive date. *Id.*

73. The Initial Coverage Denial also asserted Colony's view that the "Known Pollution Condition Exclusion" might apply "if, prior to the issuance of the Policy, the insured knew of the condition." *Id.*

74. The Initial Coverage Denial did not provide a coverage position with respect to Insuring Agreement B.2 or Insuring Agreement F. *See generally id.*

75. The Initial Coverage Denial stated Colony's position that it "would have no duty to defend or indemnify in any event until/unless the Self Insured Retention requirements are satisfied." *Id.* at 10.

76. Through counsel, Ahlstrom sent a letter dated December 11, 2023 in response to the Initial Coverage Denial (the "Dec. 11 Coverage Letter"). Dreher Decl., ¶ 10.

77. A true and correct copy of the Dec. 11 Coverage Letter is attached to the Dreher Declaration as Exhibit D. Dreher Decl., ¶ 10.

78. The Dec. 11 Coverage Letter disputed Colony's position and outlined the allegations of the Underlying Action giving rise to the possibility that the farmland sites on which Ahlstrom was alleged to have spread PFAS-containing waste qualify as "non-owned disposal sites" under the Policy. Dreher Decl., Ex. D at 3, 9–11.

79. The Dec. 11 Coverage Letter disputed Colony's position that the Underlying Action did not allege a pollution condition(s) that first commenced after applicable retroactive dates. *Id.* at 2, 11–14.

80. The Dec. 11 Coverage Letter cited Colony's failure to provide a coverage position with respect to Insuring Agreements B.2 or F and set forth Ahlstrom's view that the Underlying Action's allegations potentially trigger coverage under those Insuring Agreements as well as Insuring Agreement E. *Id.* at 3, 9, 16–18, 22.

81. Colony's counsel responded further to Ahlstrom's counsel in a letter dated February 5, 2024 (the "Second Coverage Denial"). Dreher Decl., ¶ 11.

82. A true and correct copy of the Second Coverage Denial is attached to the Dreher Declaration as Exhibit E. *Id.*

83. In the Second Coverage Denial, Colony "affirm[ed] its declination of coverage" for the Underlying Action. Dreher Decl., Ex. E at 1.

84. The Second Coverage Denial stated Colony's view, with respect to Insuring Agreements E, B.2, and F, that "the pollution condition" alleged in the Underlying Action "is the contamination of local wells," and reiterated Colony's view that this "contamination is alleged to have first commenced decades ago," and therefore the "fact that the [spreading of material allegedly containing PFAS on the Farmland Sites] is alleged to have continued after the retroactive date does not impact when the pollution condition (contaminated local ground wells) is alleged to have 'first commenced.'" *Id.* at 2–3.

85. The Second Coverage Denial stated Colony's view that the Policy did not provide coverage under Insuring Agreement B.2 because the Underlying Action "does not allege any 'pollution condition' that migrated from the Rhinelander [Site]." *Id.* at 2.

86. The Second Coverage Denial stated Colony's view that the Policy did not provide coverage under Insuring Agreement F because "there is nothing in the Complaint that suggests the contamination of area groundwater was caused by how it was unloaded" and because Colony

15

interprets the definition of the term "transportation" to mean that "'transportation' ends when waste is delivered to a 'waste disposal facility' (which [Ahlstrom] assert[s] the farms were)." *Id.*

87. The Second Coverage Denial reiterated Colony's view that the Policy did not provide coverage under Insuring Agreement E because there "is no indication in the Complaint that the farms [where material allegedly containing PFAS was spread] were sites or facilities properly licensed to accept waste." *Id.* at 3.

88. The Second Coverage Denial does not refer to any investigation by Colony to determine whether the Policy affords coverage. *Id.*

89. In a June 28, 2024 letter to Wisconsin Department of Natural Resources ("WDNR") (that is accessible to the public on a Wisconsin state website), Ahlstrom responded to WDNR's request for information related to WDNR's investigation of the presence of PFAS-containing waste in and around the Town of Stella in Oneida County, Wisconsin ("June 28 Letter to WDNR"). Dreher Decl., ¶ 12.

90. A true and correct copy of the June 28 Letter to WDNR is attached to the Dreher Declaration as Exhibit F. Dreher Decl., ¶ 12.

91. In the June 28 Letter to WDNR, Ahlstrom stated that waste material "from the Rhinelander [Site] . . . is land applied to certain Sites and Facilities pursuant to a Wisconsin Pollutant Discharge Elimination System (WPDES) individual permit issued to the Rhinelander mill, a WDNR-approved fibercake landspreading management plan (LMP), applicable WDNR regulations and any site-specific conditions in WDNR site approvals." Dreher Decl., Ex. F at 2.

92. Ultimately, Colony did not undertake the defense of Ahlstrom in the Underlying Action, has not agreed to reimburse Ahlstrom for its defense costs, and did not seek any judicial determination regarding coverage of the duty to defend. Dreher Decl., ¶ 13.

93. Colony's refusal to honor its duty to defend forced Ahlstrom to engage counsel to defend the Underlying Action. Dreher Decl., ¶ 14.

94. In connection with its defense of the Underlying Action, Ahlstrom has retained the law firm of Arnold & Porter Kaye Scholer LLP ("Arnold & Porter"). Dreher Decl., ¶ 15.

95. Ahlstrom has incurred and paid costs charged by Arnold & Porter for work and services performed as part of Ahlstrom's defense of the Underlying Action. These costs were billed via invoices sent to Ahlstrom for payment. Dreher Decl., ¶ 16.

96. True and correct copies of the cover pages of Arnold & Porter's invoices for its defense of Ahlstrom in the Underlying Action, which reflect the costs incurred by Ahlstrom, are attached to the Dreher Declaration as Exhibit G. Dreher Decl., ¶ 17.

97. True and correct copies of records evidencing Ahlstrom's payment for the services of Arnold & Porter in connection with the defense of the Underlying Action are attached to the Dreher Declaration as Exhibit H. Dreher Decl., ¶ 18.

98. As demonstrated by Exhibits G and H to the Dreher Declaration, Ahlstrom has incurred and paid legal defense costs totaling more than $500,000. Dreher Decl., ¶¶ 17–19; Dreher Decl., Ex. G; Dreher Decl., Ex. H.

99. Colony acknowledges that Ahlstrom has incurred in excess of $500,000 for work performed in connection with its defense of the Underlying Action. Dreher Decl., ¶ 20.

100. A true and correct copy of the February 20, 2025 email from Colony's counsel to Ahlstrom's counsel acknowledging the fact that Ahlstrom has incurred in excess of $500,000 in connection with its defense of the Underlying Action is attached to the Dreher Declaration as Exhibit I. Dreher Decl., ¶ 20.

101. Because Ahlstrom's defense of the Underlying Action remains ongoing, Ahlstrom continues and will continue to incur additional legal defense costs. Dreher Decl., ¶ 21.

**Dated:** February 21, 2025

**BARNES & THORNBURG LLP**
By: */s/ Kevin B. Dreher*
Kevin B. Dreher
Alice M. Kyureghian (admitted by petition)
Brian E. Foster
Mary Catherine Pachciarz
Mariana Renke
BARNES & THORNBURG LLP
1 N. Wacker Dr, Suite 4400
Chicago, IL 60606
Phone: (312) 214-8308
kdreher@btlaw.com
akyureghian@btlaw.com
bfoster@btlaw.com
marycate.pachciarz@btlaw.com
mariana.renke@btlaw.com

*Attorneys for the Ahlstrom Plaintiffs*

18